WILLIAM N. CARLON (State Bar No. 305739)
Email: william@carlonlaw.com
LAW OFFICE OF WILLIAM CARLON
437 Post Street
Napa, CA 94559
Tel: (530) 514-4115

ERINA KWON (State Bar No. 235079)
Email: erina@lawaterkeeper.org
BENJAMIN A. HARRIS (State Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street, Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>PANKL AEROSPACE SYSTEMS, a California corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387) |

Plaintiff Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I. JURISDICTION AND VENUE

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act," "CWA," or "Act") against Pankl Aerospace Systems ("Pankl" or "Defendant"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce an effluent standard or limitation). The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2. On or about January 16, 2026, Plaintiff provided written notice to Defendant, via certified mail, of Defendant's violations of the Act and of its intention to file suit against Defendant, as required by the Act ("CWA Notice Letter"). *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991). Plaintiff mailed the CWA Notice Letter to Defendant's Chief Executive Officer and Managing Director, its Secretary and Chief Financial Officer, a member of its board of directors, and its registered agent for service of process. Plaintiff also mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Attorney General of the United States; the Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Los Angeles Regional Water Quality Control Board ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991). A true and correct copy of the CWA Notice Letter is attached hereto as Exhibit 1 and is incorporated by reference.

3. More than sixty days have passed since Plaintiff served the CWA Notice

Letter on Defendant and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). Plaintiff does not seek civil penalties in this action to the extent that the EPA or the State of California has diligently prosecuted an administrative penalty action and assessed a civil penalty, which Defendant has paid, for a specific violation alleged herein, including the six numeric effluent limitation exceedances identified in Exhibit 1 to the Regional Board's Settlement Offer No. R4-2025-0237, resolved by a Stipulated Order dated July 7, 2026. *See* 33 U.S.C. § 1319(g)(6)(A). Each such administrative action by its own terms "does not address or resolve liability for any violation that is not specifically identified" therein. Plaintiff seeks civil penalties for all other violations alleged in this Complaint, and seeks declaratory and injunctive relief for all violations alleged in this Complaint, none of which is barred by Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this District. Intra-district venue is proper in the Western Division because the source of the violations is located in Cerritos, Los Angeles County, California.

## II. INTRODUCTION

5. This Complaint seeks relief for Defendant's violations of the CWA at an industrial facility owned and/or operated by Defendant. Defendant's facility is located at 16615 Edwards Road, Cerritos, California 90703 ("Facility").

6. Defendant discharges pollutant-contaminated storm water from the Facility into municipal storm drains that discharge to the North Fork of Coyote Creek, which flows to Coyote Creek, the San Gabriel River, the San Gabriel River Estuary, and San Pedro Bay, and ultimately to the Pacific Ocean (collectively, the "Receiving

Waters”).

7. The Receiving Waters are waters of the United States.

8. Defendant is violating both the substantive and procedural requirements of the CWA.

9. Defendant’s discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California’s general permit for storm water discharges associated with industrial activity, State Board National Pollutant Discharge Elimination System (“NPDES”) General Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ and Order No. 2018-0028-DWQ (“General Permit” or “Permit”).

10. Defendant’s violations of the discharge, monitoring, reporting, management practice, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

11. The failure on the part of industrial facility operators such as Defendant to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Receiving Waters. The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year. *See, e.g.,* Bay, S., *Study of the Impact of Stormwater Discharge on Santa Monica Bay* (Nov. 1999).

12. Numerous scientific studies in recent decades have documented serious health risks to recreational users of southern California’s waters from pollutant-loaded storm water discharges. *See, e.g.,* Stenstrom, M. K., *Southern California Environmental Report Card: Stormwater Impact* at 15; Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999–2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* (Santa Monica Bay Restoration Project, 1996) at 5.

13. A landmark epidemiological study showed that people who swam

directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999–2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* at 5.

14. Los Angeles County's waterways, including the San Gabriel River and its tributaries, are ecologically sensitive areas and are essential habitat for dozens of fish, bird, macro-invertebrate, and invertebrate species.

15. Los Angeles County's waterways provide numerous recreational opportunities, including biking, boating, kayaking, bird watching, horseback riding, wildlife viewing, hiking, walking, and running, as well as aesthetic and scientific-study opportunities.

16. Industrial facilities, like Defendant's, that discharge storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic-dependent wildlife, expose people to toxins, and harm the special social and economic benefits that Los Angeles County's waterways have for locals and visitors alike.

17. Pursuant to the Clean Water Act Section 303(d) list of impaired waterbodies, the North Fork of Coyote Creek is listed for the following water quality impairments: oil and grease, zinc, selenium, and indicator bacteria.

18. Coyote Creek is listed for the following water quality impairments: aluminum, ammonia, chloride, chlorine, cyanide, profenofos, temperature, copper, indicator bacteria, iron, malathion, pH, and toxicity.

19. The San Gabriel River (Reach 1) is listed for the following water quality impairments: DDT, indicator bacteria, oil and grease, pH, and temperature.

20. The San Gabriel River Estuary is listed for the following water quality impairments: chlordane, chlorine, temperature, toxicity, copper, dioxin, indicator

bacteria, nickel, and dissolved oxygen.

21. San Pedro Bay is listed for the following water quality impairments: copper, DDE, temperature, chlordane, PCBs, total DDT, and toxicity.

22. The following impairments exist within the HUC10 watershed in which the Facility is located: ammonia, cyanide, diazinon, dissolved oxygen, E. coli and enterococcus, copper, dissolved copper, zinc, lead, cadmium, nitrates and nitrites, oil, and pH.

23. Coyote Creek and its tributaries are subject to the San Gabriel River and Impaired Tributaries Metals and Selenium Total Maximum Daily Load ("TMDL"), which the General Permit implements through instantaneous maximum Numeric Effluent Limitations ("NELs") for total copper, total lead, and total zinc. General Permit, Attachment E, Table E-2.

24. Controlling polluted storm water discharges associated with industrial activity is essential to protecting southern California's surface and coastal waters and essential to LA Waterkeeper's mission.

## III. PARTIES

25. Plaintiff LA Waterkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California.

26. LA Waterkeeper's main office is located at 360 E 2nd Street, Suite 250, Los Angeles, California 90012.

27. Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and ground waters of Los Angeles County, including the San Gabriel River and its tributaries.

28. LA Waterkeeper works to achieve this goal through education, outreach, advocacy and, where necessary, litigation and enforcement actions under the Clean Water Act on behalf of itself and its members.

29. LA Waterkeeper's members live, work, and recreate in and around the Los Angeles basin, including many who live and/or recreate along the Receiving

Waters.

30. Members of LA Waterkeeper own homes and reside in Los Angeles County, and use and enjoy the San Gabriel River and its tributaries, and the bordering parks, pathways, golf courses, and athletic fields. LA Waterkeeper members also use and enjoy the Receiving Waters to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, and run. Additionally, LA Waterkeeper members use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities.

31. Defendant's discharges of storm water containing pollutants to the Receiving Waters impair each of those uses. The unlawful discharge of pollutants from the Facility also requires LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility. Thus, the interests of LA Waterkeeper and its members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit.

32. The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities.

33. Plaintiff is informed and believes, and thereupon alleges, that Defendant Pankl Aerospace Systems is a corporation organized under the laws of the State of California, California Secretary of State Entity No. 2230151, with its principal office at 16615 Edwards Road, Cerritos, California 90703.

34. Plaintiff is informed and believes, and thereupon alleges, that Defendant owns and/or operates the Facility, and is subject to the terms of the General Permit.

35. Defendant is a "person" within the meaning of the Act. 33 U.S.C. § 1362(5).

36. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

# IV. LEGAL BACKGROUND

## A. The Clean Water Act

37. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and a technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

38. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

39. The term "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

40. A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

41. "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).

42. Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and specifically requires an NPDES permit for storm water discharges associated with industrial activity. *Id.* § 1342(p)(2)(B).

43. Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent standard or limitation" to include "a permit or condition thereof issued under [Section 402] of this title" and "an unlawful act under subsection (a) of [Section 301] of this title").

44. An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $68,445 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B. California's General Industrial Storm Water Permit**

45. Section 402(b) of the Act authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b).

46. Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California's State Board to issue NPDES permits, including general NPDES permits, in California.

47. The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997, and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The State Board amended the General Permit by Order No. 2015-0122-DWQ and by Order No. 2018-0028-DWQ; the 2018 amendment, which incorporated

TMDL implementation requirements, became effective on July 1, 2020.

48. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent ("NOI"). The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

49. Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit. A violation of the General Permit is a violation of the Act. *See* General Permit, Section XXI.A.

50. In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

51. The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, effluent limitations, and receiving water limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) monitoring and reporting requirements, including the requirement to prepare an annual report.

52. Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the General Permit prohibits industrial storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the California Water Code. Discharge Prohibition III.D of the General Permit prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board Water Quality Control Plan ("Basin Plan") or statewide water quality control plans and policies.

53. Receiving Water Limitation VI.A of the General Permit requires

dischargers to ensure that industrial storm water discharges and authorized non-storm water discharges do not cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water. Receiving Water Limitation VI.B of the General Permit requires dischargers to ensure that such discharges do not adversely affect human health or the environment. Receiving Water Limitation VI.C of the General Permit requires dischargers to ensure that such discharges do not contain pollutants in quantities that threaten to cause pollution or a public nuisance.

54. Effluent Limitation V.A of the General Permit requires dischargers to implement Best Management Practices ("BMPs") that comply with the Best Available Technology Economically Achievable ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharges in a manner that reflects best industry practice considering technological availability and economic practicability and achievability. BAT applies to toxic and nonconventional pollutants; BCT applies to conventional pollutants. Conventional pollutants include total suspended solids, oil and grease, pH, biochemical oxygen demand, and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15–401.16.

55. Effluent Limitation V.C of the General Permit requires dischargers located within a watershed for which a TMDL has been approved by the EPA to comply with the applicable TMDL-specific permit requirements set forth in Attachment E to the General Permit. Responsible dischargers must compare all sampling and analytical results obtained from each distinct sampling location to the corresponding instantaneous maximum NEL values in TMDL Compliance Table E-2. An instantaneous maximum NEL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value. "An exceedance of an NEL is a violation of this General Permit." General Permit, Section V.C.1.

56. On July 1, 2020, the TMDL implementation requirements added to the

General Permit by Order No. 2018-0028-DWQ became effective and enforceable. General Permit, Attachment E. Any exceedance of an NEL following July 1, 2020 is a per se violation of the General Permit and the Clean Water Act.

57. For dischargers to Coyote Creek or its tributaries, including Defendant, the applicable NELs established by the San Gabriel River Metals and Selenium TMDL are: total copper – 0.027 mg/L; total lead – 0.106 mg/L; and total zinc – 0.158 mg/L (instantaneous maximum). General Permit, Attachment E, Table E-2. In recent reporting years, and following the effective date of the NELs for Coyote Creek and its tributaries, Defendant repeatedly exceeded the NELs for zinc and copper, and LA Waterkeeper alleges that Defendant will continue to exceed the NELs in the future.

58. The 2008, 2015, and 2021 versions of the EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which are pollutant concentration values for industrial storm water discharges ("EPA Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective September 29, 2021.

59. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a permitted facility achieve the statutory BAT/BCT standards. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766–67 (Oct. 30, 2000).

60. The discharge of storm water containing pollutant concentrations exceeding EPA Benchmarks evidences a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 921–25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

61. The following EPA Benchmarks have been established, effective

September 29, 2021, for pollutants discharged by Defendant: total suspended solids – 100 mg/L; pH – 6.0–9.0 s.u.; zinc – 0.12 mg/L; aluminum – 1.1 mg/L; copper – 0.00519 mg/L; nickel – 0.470 mg/L; and nitrate plus nitrite nitrogen – 0.68 mg/L.

62. The General Permit likewise establishes Numeric Action Levels ("NALs") that serve as guidelines for determining whether a facility discharging industrial storm water has implemented BMPs that achieve BAT/BCT. General Permit, Section XII.A and Table 2. The following annual NALs have been established for pollutants discharged by Defendant: total suspended solids – 100 mg/L; oil and grease – 15.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; copper – 0.0332 mg/L; iron – 1.0 mg/L; nickel – 1.02 mg/L; and nitrate plus nitrite nitrogen – 0.68 mg/L. The following instantaneous maximum NALs have been established for pollutants discharged by Defendant: pH – 6.0–9.0 s.u.; total suspended solids – 400 mg/L; and oil and grease – 25.0 mg/L.

63. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. General Permit, Section XII.A.1. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit, Section XII.A.2. If a discharger has an NAL exceedance during a reporting year, the discharger's status for that parameter changes to Level 1, and the discharger must comply with the Exceedance Response Action ("ERA") requirements set forth in Section XII.C of the General Permit. The discharger's status changes to Level 2 if sampling results indicate an NAL exceedance for a parameter while the discharger is in Level 1 status for that parameter, and the discharger must then comply with Section XII.D of the General Permit.

64. The California Toxics Rule ("CTR") is an applicable water quality standard under the General Permit, the violation of which is a violation of General

Permit conditions. *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 124 F. Supp. 3d 1007, 1020–22 (E.D. Cal. 2015).

65. The CTR establishes numeric receiving water criteria for toxic pollutants in California surface waters. 40 C.F.R. § 131.38 (2000). The CTR establishes numeric criteria for at least the following pollutants discharged by Defendant: zinc – 0.12 mg/L (maximum concentration); copper – 0.013 mg/L (maximum concentration); and nickel – 0.470 mg/L (maximum concentration).

66. The Water Quality Control Plan for the Los Angeles Region ("Basin Plan") sets forth water quality standards and prohibitions applicable to Defendant's storm water discharges from the Facility. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life." Basin Plan ch. 3, at 3-45 (May 6, 2019).

67. The Basin Plan's water quality standards require a pH range of 6.5–8.5 pH units for inland surface waters such as Coyote Creek and the San Gabriel River. Basin Plan ch. 3, at 3-40 (May 6, 2019).

68. Special Condition XX.B of the General Permit requires a discharger, upon its own determination or upon written notification by the Regional Board that its industrial storm water discharges contain pollutants that are in violation of the Receiving Water Limitations (Section VI), or in the event that its industrial storm water discharge exceeds an NEL in Attachment E, to conduct a facility evaluation to identify pollutant sources, assess its SWPPP and BMP implementation, and certify and submit via the State Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") documentation that additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations or applicable NELs, or that no such measures are required. General Permit, Section XX.B.1.

69. The General Permit requires dischargers to develop and implement a site-

specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *Id.*

70. Dischargers must revise their SWPPP whenever necessary; certify and submit via SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions; and, for non-significant revisions, certify and submit via SMARTS their SWPPP not more than once every three months in the reporting year. General Permit, Section X.B.

71. Dischargers must, to the extent feasible, implement and maintain all of the minimum BMPs identified in Section X.H.1 of the General Permit: (a) good housekeeping; (b) preventive maintenance; (c) spill and leak prevention and response; (d) material handling and waste management; (e) erosion and sediment controls; (f) an employee training program; and (g) quality assurance and record keeping. In addition to the minimum BMPs, dischargers must implement advanced BMPs, including exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs, where necessary to reduce or prevent discharges of pollutants in their storm water discharges in a manner that reflects best industry practice. General Permit, Section X.H.2.

72. Section XV of the General Permit requires dischargers to conduct one Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") for each reporting year, including a review and effectiveness assessment of all BMPs for each area of industrial activity, and to revise the SWPPP as appropriate and implement the revisions within 90 days of the Annual Evaluation.

73. The General Permit requires dischargers to eliminate all non-storm water

discharges to storm water conveyance systems other than those specifically authorized in Section IV of the General Permit unless authorized by another NPDES permit. General Permit, Section III.B.

74. The General Permit requires dischargers to develop and implement a Monitoring Implementation Plan as part of the SWPPP. General Permit, Section X.I. As part of the Monitoring Implementation Plan, dischargers must identify all storm water discharge locations. General Permit, Section X.I.2.a. Dischargers must conduct monthly visual observations of each drainage area, as well as visual observations during sampling events. General Permit, Sections XI.A.1 and XI.A.2. Dischargers must collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30). General Permit, Section XI.B.2. Except as provided in Section XI.C.4, samples must be collected from each drainage area at all discharge locations. General Permit, Section XI.B.4. Dischargers must analyze all collected samples for total suspended solids, oil and grease, and pH; for additional parameters identified on a facility-specific basis that serve as indicators of the industrial pollutants identified in the pollutant source assessment; for the industry-specific parameters set forth in Table 1 of the General Permit; and for additional parameters related to receiving waters with 303(d)-listed impairments or approved TMDLs. General Permit, Section XI.B.6.

75. Dischargers must submit all sampling and analytical results via SMARTS within 30 days of obtaining all results for each sampling event. General Permit, Section XI.B.11.a.

76. Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year. General Permit, Section XVI.A. The Annual Report must include a compliance checklist indicating whether the discharger complies with, and has addressed, all applicable requirements of the General Permit; an explanation for any non-compliance within the reporting year; an

identification of all revisions made to the SWPPP within the reporting year; and the date of the Annual Evaluation. General Permit, Section XVI.B. All reports, certifications, and other information submitted via SMARTS must be certified by the discharger's Legally Responsible Person or Duly Authorized Representative under penalty of law. General Permit, Section XXI.K–L.

## V. STATEMENT OF FACTS

### A. The Facility

77. Defendant owns and/or operates the Facility, an approximately 3.4-acre (147,636 square-foot) industrial site located at 16615 Edwards Road, Cerritos, California 90703. Approximately 95 percent of the Facility is impervious surface.

78. According to its SWPPP, last revised January 31, 2023 and certified and uploaded to SMARTS on or about February 1, 2023 ("2023 SWPPP"), the Facility's primary industrial purpose is the production of aerospace components involving high precision turning, milling, honing, trepanning, gun drilling, and upsetting of parts up to 30 feet in length, including rigid and rotary wing components. The 2023 SWPPP states that the Facility's hours of operation are Monday through Friday, 8:00 a.m. to 8:00 p.m.

79. Defendant conducts industrial activities both indoors and outdoors at the Facility. Industrial activities at the Facility include, but are not limited to: high precision machining of metal alloys, including aluminum, steel, stainless steel, titanium, and Inconel alloys; outdoor storage of metal alloy stock; outdoor storage of metal debris and machining waste in cubic-yard bins and 20-foot roll-off containers; outdoor storage of hazardous wastes and liquid industrial materials, including used oils, caustic solutions, gear oil, lubricants, hydraulic oil, and solvents; operation of outdoor air compressors; truck and forklift traffic; shipping and receiving; and the operation of equipment in support of these activities.

80. Defendant submitted a Notice of Intent to comply with the General Permit for the Facility on or about July 13, 2017. The Facility is assigned Waste

Discharge Identification ("WDID") No. 4 19I018975.

81. Defendant's NOI identified the Facility's primary Standard Industrial Classification ("SIC") code as 3471 (Electroplating, Plating, Polishing, Anodizing, and Coloring). The 2023 SWPPP identifies the Facility's SIC code as 3728 (Aircraft Parts and Auxiliary Equipment). On or about January 20, 2026, Defendant submitted a change of information via SMARTS changing the Facility's primary SIC code to 3728, stating that "[p]lating and polishing activities detailed in code 3471 are not done at the facility."

82. Since at least the 2011–2012 reporting year, the Facility has operated under General Permit coverage, and Defendant has submitted Annual Reports for the Facility under WDID No. 4 19I018975 since at least July 2012. According to the SWPPP Defendant certified and uploaded to SMARTS in February 2016, the Facility's SWPPP was originally prepared in September 2004.

83. According to the 2023 SWPPP, Defendant collects storm water associated with industrial activities at the Facility and discharges it at two discharge locations, which Defendant designates as sampling point "SP1" (the east Edwards Road entrance) and sampling point "SP2" (the north Edwards Road entrance at 166th Street). The 2023 SWPPP states that runoff from the north Edwards Road entrance enters a three-foot municipal catch basin, and that runoff from the east Edwards Road entrance travels south on Edwards Road approximately 0.2 miles and enters a twelve-foot municipal catch basin, and that both discharges flow to Coyote Creek.

84. The 2023 SWPPP divides the Facility into two drainage management areas, DMA 1 and DMA 2, plus an additional area designated as parking. DMA 1 is a small portion of the Facility in the northwest corner that discharges toward 166th Street. DMA 2 encompasses most of the western and southern portions of the Facility and receives the runoff from the Facility's roof via downspouts along the west and south sides of the main building.

85. According to the Los Angeles County Department of Public Works storm

drain map, runoff from the Facility that flows north toward 166th Street enters the municipal separate storm sewer system ("MS4") there and flows via the "Carmenita Drain – Main" to the east, where it discharges into the North Fork of Coyote Creek. Runoff that flows east from the Facility runs south along Edwards Road until it reaches an MS4 drain labeled "MTD 132," which also discharges to the North Fork of Coyote Creek.

86. All primary machining operations at the Facility, including lathe work, grinding, drawing, honing, milling, soaking, and trepanning, occur inside the main manufacturing building. These processes generate metal debris that is initially contained at each machine and later staged outdoors for off-site recycling. The 2023 SWPPP acknowledges that metal debris may be tracked from indoor processing areas into outdoor areas through routine foot and forklift traffic.

87. Each machining system at the Facility uses significant volumes of oil, with individual machine oil capacities ranging from approximately 52 to 1,000 gallons. The 2023 SWPPP recognizes that a rupture or failure of these oil systems presents a substantial spill risk, with the potential for oils to migrate outdoors and discharge from the property if containment and spill response controls fail.

88. Compressed air for plant operations is supplied by outdoor compressors located on the west side of the main building. These compressors generate oily water that is collected in 55-gallon drums stored on containment pallets. The 2023 SWPPP identifies drum overflow or tip-over as a spill scenario that could result in a discharge through the north Edwards Road entrance.

89. Truck and forklift traffic is concentrated at the north Edwards Road gate and along the west side of the Facility. The 2023 SWPPP acknowledges that tire wear from tight turning movements generates tire tread debris that accumulates on outdoor pavement, and identifies tire debris as a source of zinc in storm water runoff from these traffic areas.

90. The majority of outdoor industrial storage at the Facility occurs on the

west side of the property. Metal alloy stock, including steel, stainless steel, titanium, and Inconel, is stored outdoors in racks and is exposed to precipitation. The 2023 SWPPP acknowledges that surface oxidation of these metals can occur and that dissolved metals may be mobilized by storm water if materials are left uncovered, and states that discharges from these areas flow toward the north Edwards Road gate.

91. Metal debris generated indoors is stored outdoors in cubic-yard bins and 20-foot roll-off containers. This debris is contaminated with cutting oils. The 2023 SWPPP acknowledges that many roll-off bins are in poor condition and may contain holes or cracks capable of releasing metal particulates and oil-laden liquids if exposed to storm water.

92. Hazardous wastes and liquid hazardous materials are stored outdoors at the southwest portion of the Facility. Hazardous wastes primarily include used oils and, to a lesser extent, caustic solutions, stored in 55-gallon containers on secondary containment pallets. Liquid industrial materials such as gear oil, lubricants, hydraulic oil, and solvents (including acetone) are likewise stored in drums with secondary containment. The 2023 SWPPP acknowledges that a tip-over or failure of these containers could result in releases of up to 55 gallons and that spills from these areas could migrate offsite toward east Edwards Road if not fully contained.

93. The 2023 SWPPP identifies copper, aluminum, nickel, zinc, oil, nitrate, nitrite, and pH as pollutants associated with the industrial activities at the Facility that are also impairments of the Facility's receiving waters.

94. The areas of industrial activity described above are sources of pollutants at the Facility. From these areas, the Facility discharges storm water containing pollutants to the MS4, which discharges to the North Fork of Coyote Creek, Coyote Creek, the San Gabriel River, the San Gabriel River Estuary, San Pedro Bay, and the Pacific Ocean.

95. The North Fork of Coyote Creek is a water of the United States.

96. Coyote Creek is a water of the United States.

97. The San Gabriel River is a water of the United States.

98. The San Gabriel River Estuary is a water of the United States.

99. San Pedro Bay is a water of the United States.

100. The Pacific Ocean is a water of the United States.

**B. The Facility's Storm Water Discharges**

101. Defendant discharges storm water containing pollutants, including zinc, copper, aluminum, iron, nickel, total suspended solids, nitrate plus nitrite nitrogen, oil and grease, and compounds affecting pH, from the Facility during every significant rain event.

102. Defendant's storm water sampling results, as reported by Defendant to the State Board via SMARTS under penalty of law, are conclusive evidence of the pollutant concentrations in the Facility's storm water discharges. *See Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1493 (9th Cir. 1987).

**1. Zinc**

103. The storm water sample collected by Defendant at the Facility's sampling point SP2 on March 21, 2023 contained zinc at a concentration of 0.159 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

104. The storm water sample collected by Defendant at the Facility's sampling point SP1 on August 21, 2023 contained zinc at a concentration of 0.337 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

105. The storm water sample collected by Defendant at the Facility's sampling point SP1 on November 15, 2023 contained zinc at a concentration of 0.738 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

106. The storm water sample collected by Defendant at the Facility's sampling point SP2 on December 21, 2023 contained zinc at a concentration of 0.297

mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

107. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 1, 2024 contained zinc at a concentration of 0.315 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

108. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 20, 2024 contained zinc at a concentration of 0.170 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

109. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on or about January 27, 2025 (which Defendant certified to SMARTS as a February 13, 2025 sampling event) contained zinc at a concentration of 1.25 mg/L and 6.86 mg/L, respectively, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

110. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on March 5, 2025 contained zinc at a concentration of 0.645 mg/L and 0.235 mg/L, respectively, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

111. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on October 14, 2025 contained zinc at a concentration of 0.213 mg/L and 1.04 mg/L, respectively, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

112. The storm water sample collected by Defendant at the Facility's sampling point SP2 on November 15, 2025 contained zinc at a concentration of 0.235 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12

mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

113. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on December 26, 2025 contained zinc at a concentration of 0.159 mg/L and 0.212 mg/L, respectively, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

114. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 11, 2026 contained zinc at a concentration of 0.318 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

115. The storm water sample collected by Defendant at the Facility's sampling point SP2 on February 16, 2026 contained zinc at a concentration of 0.169 mg/L, in excess of the NEL for zinc (0.158 mg/L), the CTR criterion for zinc (0.12 mg/L), and the EPA Benchmark for zinc (0.12 mg/L).

116. The storm water sample collected by Defendant at the Facility's sampling point SP1 on March 21, 2023 contained zinc at a concentration of 0.143 mg/L, and the storm water sample collected at SP1 on January 3, 2024 contained zinc at a concentration of 0.15 mg/L, each in excess of the CTR criterion and the EPA Benchmark for zinc (0.12 mg/L).

117. The average concentration of zinc in all storm water samples collected by Defendant at the Facility during the 2024–2025 reporting year was 1.52 mg/L, as calculated in Defendant's December 2025 ERA Level 1 Technical Report, in excess of the annual NAL for zinc (0.26 mg/L). Plaintiff is informed and believes, and thereupon alleges, that the average concentration of zinc in all storm water samples collected by Defendant at the Facility during the 2025–2026 reporting year likewise exceeded the annual NAL for zinc.

**2. Copper**

118. The storm water sample collected by Defendant at the Facility's

sampling point SP1 on November 15, 2023 contained copper at a concentration of 0.0601 mg/L, in excess of the NEL for copper (0.027 mg/L), the annual NAL for copper (0.0332 mg/L), the CTR criterion for copper (0.013 mg/L), and the EPA Benchmark for copper (0.00519 mg/L).

119. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on or about January 27, 2025 (which Defendant certified to SMARTS as a February 13, 2025 sampling event) contained copper at a concentration of 0.0501 mg/L and 0.0416 mg/L, respectively, in excess of the NEL for copper (0.027 mg/L), the annual NAL for copper (0.0332 mg/L), the CTR criterion for copper (0.013 mg/L), and the EPA Benchmark for copper (0.00519 mg/L).

120. The storm water sample collected by Defendant at the Facility's sampling point SP2 on March 21, 2023 contained copper at a concentration of 0.0144 mg/L, in excess of the CTR criterion for copper (0.013 mg/L) and the EPA Benchmark for copper (0.00519 mg/L).

121. The storm water sample collected by Defendant at the Facility's sampling point SP2 on May 31, 2023 contained copper at a concentration of 0.023 mg/L, in excess of the CTR criterion for copper (0.013 mg/L) and the EPA Benchmark for copper (0.00519 mg/L).

122. The storm water sample collected by Defendant at the Facility's sampling point SP2 on November 15, 2023 contained copper at a concentration of 0.0148 mg/L, in excess of the CTR criterion for copper (0.013 mg/L) and the EPA Benchmark for copper (0.00519 mg/L).

123. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 1, 2024 contained copper at a concentration of 0.0148 mg/L, in excess of the CTR criterion for copper (0.013 mg/L) and the EPA Benchmark for copper (0.00519 mg/L).

124. The storm water sample collected by Defendant at the Facility's

sampling point SP2 on March 13, 2025 contained copper at a concentration of 0.0151 mg/L, in excess of the CTR criterion for copper (0.013 mg/L) and the EPA Benchmark for copper (0.00519 mg/L).

125. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 11, 2026 contained copper at a concentration of 0.0151 mg/L, in excess of the CTR criterion for copper (0.013 mg/L) and the EPA Benchmark for copper (0.00519 mg/L).

**3. Aluminum**

126. The storm water sample collected by Defendant at the Facility's sampling point SP2 on March 21, 2023 contained aluminum at a concentration of 1.53 mg/L, in excess of the EPA Benchmark for aluminum (1.1 mg/L) and the annual NAL for aluminum (0.75 mg/L).

127. The storm water sample collected by Defendant at the Facility's sampling point SP1 on or about January 27, 2025 (which Defendant certified to SMARTS as a February 13, 2025 sampling event) contained aluminum at a concentration of 4.44 mg/L, in excess of the EPA Benchmark for aluminum (1.1 mg/L) and the annual NAL for aluminum (0.75 mg/L).

128. The storm water sample collected by Defendant at the Facility's sampling point SP2 on November 15, 2025 contained aluminum at a concentration of 1.63 mg/L, in excess of the EPA Benchmark for aluminum (1.1 mg/L) and the annual NAL for aluminum (0.75 mg/L).

129. The storm water sample collected by Defendant at the Facility's sampling point SP1 on December 29, 2021 contained aluminum at a concentration of 0.9 mg/L, in excess of the annual NAL for aluminum (0.75 mg/L).

130. The storm water sample collected by Defendant at the Facility's sampling point SP2 on May 31, 2023 contained aluminum at a concentration of 0.795 mg/L, in excess of the annual NAL for aluminum (0.75 mg/L).

131. The storm water sample collected by Defendant at the Facility's

sampling point SP1 on August 21, 2023 contained aluminum at a concentration of 0.803 mg/L, in excess of the annual NAL for aluminum (0.75 mg/L).

132. The average concentration of aluminum in all storm water samples collected by Defendant at the Facility exceeded the annual NAL for aluminum (0.75 mg/L) in the 2021–2022 reporting year (0.9 mg/L) and in the 2024–2025 reporting year (0.87 mg/L, as calculated in Defendant's December 2025 ERA Level 1 Technical Report).

**4. Nitrate Plus Nitrite Nitrogen**

133. The storm water sample collected by Defendant at the Facility's sampling point SP1 on March 15, 2021 contained nitrate plus nitrite nitrogen at a concentration of 0.8 mg/L, in excess of the EPA Benchmark and the annual NAL for nitrate plus nitrite nitrogen (0.68 mg/L).

134. The storm water sample collected by Defendant at the Facility's sampling point SP2 on November 15, 2023 contained nitrate plus nitrite nitrogen at a concentration of 6.04 mg/L, in excess of the EPA Benchmark and the annual NAL for nitrate plus nitrite nitrogen (0.68 mg/L).

135. The storm water sample collected by Defendant at the Facility's sampling point SP2 on October 14, 2025 contained nitrate plus nitrite nitrogen at a concentration of 1.82 mg/L, in excess of the EPA Benchmark and the annual NAL for nitrate plus nitrite nitrogen (0.68 mg/L).

136. The average concentration of nitrate plus nitrite nitrogen in all storm water samples collected by Defendant at the Facility during the 2020–2021 reporting year was 0.80 mg/L, in excess of the annual NAL for nitrate plus nitrite nitrogen (0.68 mg/L). Defendant's status for nitrate plus nitrite nitrogen advanced to Level 1 in the 2020–2021 reporting year and to Level 2 in the 2021–2022 reporting year.

**5. Total Suspended Solids**

137. The storm water sample collected by Defendant at the Facility's sampling point SP1 on August 21, 2023 contained total suspended solids at a

concentration of 112 mg/L, in excess of the EPA Benchmark and the annual NAL for total suspended solids (100 mg/L).

138. The storm water sample collected by Defendant at the Facility's sampling point SP2 on November 15, 2023 contained total suspended solids at a concentration of 182 mg/L, in excess of the EPA Benchmark and the annual NAL for total suspended solids (100 mg/L).

139. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 1, 2024 contained total suspended solids at a concentration of 115 mg/L, in excess of the EPA Benchmark and the annual NAL for total suspended solids (100 mg/L).

140. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on or about January 27, 2025 (which Defendant certified to SMARTS as a February 13, 2025 sampling event) contained total suspended solids at a concentration of 154 mg/L and 261 mg/L, respectively, in excess of the EPA Benchmark and the annual NAL for total suspended solids (100 mg/L).

141. The storm water sample collected by Defendant at the Facility's sampling point SP2 on March 5, 2025 contained total suspended solids at a concentration of 229 mg/L, in excess of the EPA Benchmark and the annual NAL for total suspended solids (100 mg/L).

142. The average concentration of total suspended solids in all storm water samples collected by Defendant at the Facility during the 2024–2025 reporting year was 127 mg/L, as calculated in Defendant's December 2025 ERA Level 1 Technical Report, in excess of the annual NAL for total suspended solids (100 mg/L).

**6. Iron**

143. The storm water sample collected by Defendant at the Facility's sampling point SP1 on March 21, 2023 contained iron at a concentration of 1.13 mg/L, in excess of the annual NAL for iron (1.0 mg/L).

144. The storm water sample collected by Defendant at the Facility's sampling point SP2 on May 31, 2023 contained iron at a concentration of 1.79 mg/L, in excess of the annual NAL for iron (1.0 mg/L).

145. The storm water sample collected by Defendant at the Facility's sampling point SP1 on February 1, 2024 contained iron at a concentration of 1.03 mg/L, in excess of the annual NAL for iron (1.0 mg/L).

146. The storm water sample collected by Defendant at the Facility's sampling point SP2 on November 15, 2025 contained iron at a concentration of 1.54 mg/L, in excess of the annual NAL for iron (1.0 mg/L).

**7. pH**

147. The storm water sample collected by Defendant at the Facility's sampling point SP1 on March 15, 2021 had a pH of 3.5 s.u., outside the EPA Benchmark and instantaneous maximum NAL range for pH (6.0–9.0 s.u.) and outside the Basin Plan range for pH (6.5–8.5 s.u.).

148. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on November 15, 2023 had a pH of 9.7 s.u. and 9.6 s.u., respectively, outside the EPA Benchmark and instantaneous maximum NAL range for pH (6.0–9.0 s.u.) and outside the Basin Plan range for pH (6.5–8.5 s.u.). These two results constitute an instantaneous maximum NAL exceedance for pH in the 2023–2024 reporting year.

149. The storm water samples collected by Defendant at the Facility's sampling points SP1 and SP2 on March 21, 2023 had a pH of 6.0 s.u. and 6.2 s.u., respectively, outside the Basin Plan range for pH (6.5–8.5 s.u.).

**8. Defendant's Sample Results Are Evidence of Violations of the General Permit**

150. A true and accurate summary of the data reported by Defendant to the State Board via SMARTS through the date of the CWA Notice Letter, which is the basis for the allegations contained in the preceding paragraphs of this Section V.B, is

contained in Section II.A.3 of the CWA Notice Letter. The results for the December 26, 2025, February 11, 2026, and February 16, 2026 sampling events are reported in the laboratory reports Defendant submitted to SMARTS after the date of the CWA Notice Letter, and evidence the same, continuing violations identified in the CWA Notice Letter.

151. Storm water discharges from the Facility containing zinc or copper at concentrations exceeding the General Permit's NELs for zinc and copper are violations of the General Permit and the Act. General Permit, Sections V.C.1 and VII.

152. Exceedances of the EPA Benchmarks and NALs evidence repeated failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions.

153. Failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions are violations of the General Permit's technology-based effluent limitations and the Act. General Permit, Section V.A.

154. Storm water discharges from the Facility containing pollutants at concentrations exceeding the CTR criteria, the Basin Plan's pH range, and the Basin Plan's narrative toxicity standard cause or contribute to exceedances of applicable water quality standards in the Receiving Waters, in violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions. General Permit, Sections III.C, III.D, VI.A, VI.B, and VI.C.

155. Plaintiff is informed and believes, and thereupon alleges, that Defendant has known that its storm water discharges contain pollutants at concentrations exceeding applicable NELs, water quality standards, EPA Benchmarks, and NALs since at least January 16, 2021.

156. Plaintiff is informed and believes, and thereupon alleges, that such violations occur each time storm water discharges from the Facility. Attachment A to the CWA Notice Letter identifies the specific dates on which Plaintiff alleges Defendant discharged storm water containing pollutants in violation of the General

Permit, and is incorporated herein by reference.

**C. Defendant's Failure to Implement BAT/BCT**

157. Defendant has failed to implement and maintain the minimum BMPs required by the General Permit, including good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, employee training, and quality assurance and record keeping, as evidenced by the exceedances identified above. General Permit, Section X.H.1(a)–(g).

158. Defendant has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, or other advanced BMPs necessary to comply with the General Permit's effluent limitations. General Permit, Section X.H.2.

159. Defendant's own ERA submissions attribute its repeated NAL exceedances to known industrial sources, including the handling and storage of spent CNC coolant; leaking and poorly maintained outdoor scrap and roll-off bins containing oil-laden metal debris; outdoor storage of aluminum- and zinc-containing alloys exposed to weathering; tire wear from truck and forklift traffic; and the tracking of metal particulates and coolant residuals from indoor machining operations to outdoor paved areas where pollutants commingle with storm water runoff.

160. Despite identifying these recurring industrial sources, Defendant has not implemented structural treatment controls, permanent containment, or equivalent physical source controls at the Facility. The BMPs Defendant has relied upon to address its repeated exceedances consist almost exclusively of non-structural administrative measures, including increased sweeping, employee training, material management practices, and general preventive maintenance. Defendant's December 2025 ERA Level 1 Technical Report states that the Facility has "[n]o advanced

BMPs."

161. Defendant has acknowledged that at least one primary roll-off bin used for outdoor metal debris storage was in poor condition, actively leaking, and reliant only on a drip pan for containment, with no confirmed replacement implemented. Defendant has also acknowledged that outdoor scrap metal bins must be manually covered to prevent exposure to storm water, yet continued aluminum, zinc, and total suspended solids exceedances demonstrate that these manual controls have not been effective.

162. With respect to its pH exceedances, Defendant attributed the exceedances to improper calibration of its field sampling equipment and selected employee retraining as its sole corrective action.

163. Since implementing the BMPs described in its ERA submissions, Defendant has continued to report exceedances of NELs, EPA Benchmarks, and NALs for zinc, copper, aluminum, total suspended solids, and nitrate plus nitrite nitrogen, and entered Level 1 status for aluminum, total suspended solids, and zinc in the 2024–2025 reporting year.

164. Each day that Defendant has failed to develop and implement BMPs that achieve BAT and BCT at the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant has been in violation of the BAT and BCT requirements at the Facility every day since at least January 16, 2021.

**D. Defendant's Failure to Develop and Implement an Adequate SWPPP**

165. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate SWPPP for the Facility.

166. Defendant's 2023 SWPPP does not include a compliant site map, adequate pollutant source descriptions or assessments, or adequate BMPs or descriptions of BMPs. Among other deficiencies, the site map in the 2023 SWPPP incorrectly identifies the Facility's receiving water, and the 2023 SWPPP does not

identify all pollutants associated with the metal alloys, including Inconel alloys, used at the Facility.

167. Defendant has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary in response to the analytical results of its storm water monitoring, including its repeated NEL exceedances for zinc and copper, as required by the General Permit. General Permit, Sections X.B, XV, and XX.B. Plaintiff is informed and believes, and thereupon alleges, that Defendant did not certify and submit a revised SWPPP via SMARTS between February 1, 2023 and the date of the CWA Notice Letter, notwithstanding NEL exceedances for zinc in the 2022–2023, 2023–2024, 2024–2025, and 2025–2026 reporting years and NEL exceedances for copper in the 2023–2024 and 2024–2025 reporting years.

168. The discharges of storm water from the Facility containing pollutant concentrations exceeding NELs, EPA Benchmarks, NALs, and water quality standards evidence Defendant's failure to develop, implement, and revise a lawful SWPPP.

169. Each day that Defendant has failed to develop and implement an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and the Act. Defendant has been in violation of the SWPPP requirements of the General Permit every day since at least January 16, 2021.

**E. Defendant's Failure to Implement an Adequate Monitoring Implementation Plan**

170. Defendant has conducted and continues to conduct industrial activities at the Facility without developing, implementing, or revising a compliant Monitoring Implementation Plan.

171. Defendant has failed to collect and analyze storm water samples from the required number of QSEs in each half of each reporting year. Specifically, Defendant collected no samples at SP1 or SP2 during the first half of the 2020–2021 reporting year, one sample at SP1 and no samples at SP2 during the second half of the 2020–

2021 reporting year, one sample at SP1 and no samples at SP2 during the first half of the 2021–2022 reporting year, no samples at SP1 or SP2 during the second half of the 2021–2022 reporting year, no samples at SP1 or SP2 during the first half of the 2022–2023 reporting year, and no samples at SP1 or SP2 during the first half of the 2024–2025 reporting year.

172. Defendant has failed to analyze the storm water samples it did collect for all required parameters. Among other things, Defendant failed to analyze its storm water samples for copper, a TMDL pollutant for which an NEL applies to the Facility's discharges, from at least December 12, 2020 until March 21, 2023, and again for the samples collected on October 14, 2025, November 15, 2025, and December 26, 2025. Plaintiff is further informed and believes, and thereupon alleges, that Defendant has failed to analyze its storm water samples for pollutants, including chromium, associated with the Inconel and other alloys used at the Facility.

173. Defendant has failed to timely submit sampling and analytical results via SMARTS within 30 days of obtaining all results for each sampling event, as required by Section XI.B.11.a of the General Permit. Among other things, Defendant certified laboratory results dated February 2, 2022 to SMARTS on or about July 6, 2022, and Defendant certified to SMARTS analytical results for a February 13, 2025 sampling event, although the laboratory report attached to that submission shows that the samples were collected on January 27, 2025, and Defendant did not upload the laboratory report until April 15, 2025.

174. Each day that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility is a separate and distinct violation of the General Permit and the Act. Defendant has been in violation of the monitoring requirements of the General Permit every day since at least January 16, 2021.

**F. Defendant's Failure to Submit Timely, True, and Correct Reports**

175. Plaintiff is informed and believes, and thereupon alleges, that Defendant

has failed to submit all reports required by Sections XII and XX.B of the General Permit in response to its numerous exceedances of NELs and NALs. Among other things, Plaintiff is informed and believes that Defendant did not certify and submit via SMARTS a Water Quality Based Corrective Action report pursuant to Section XX.B of the General Permit in response to its NEL exceedances for zinc in the 2022–2023, 2023–2024, and 2024–2025 reporting years, or its NEL exceedances for copper in the 2023–2024 and 2024–2025 reporting years, prior to the date of the CWA Notice Letter.

176. Plaintiff is informed and believes, and thereupon alleges, that the ERA reports Defendant has submitted are inadequate, as evidenced by Defendant's continued exceedances after the purported full implementation of the BMPs described therein.

177. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to accurately report its non-compliance with the General Permit in the Facility's Annual Reports, including by certifying compliance with the General Permit's sampling requirements in reporting years in which Defendant did not collect the required number of samples or analyze its samples for all required parameters.

178. Each day that Defendant has failed to submit timely, true, and correct reports is a separate and distinct violation of the General Permit and the Act. Defendant has been in violation of the reporting requirements of the General Permit every day since at least January 16, 2021.

**G. Regional Board Enforcement**

179. On or about April 3, 2025, the Regional Board issued to Defendant Settlement Offer No. R4-2025-0131, an offer to participate in the Regional Board's Expedited Payment Program with respect to a late-reporting violation in the 2021–2022 reporting year, proposing a mandatory minimum penalty of $12,000 under California Water Code section 13385. Plaintiff is informed and believes, and thereupon alleges, that no stipulated order resolving Settlement Offer No. R4-2025-

0131 has been issued.

180. On or about November 24, 2025, the Regional Board issued to Defendant Settlement Offer No. R4-2025-0237 with respect to six NEL exceedances for zinc and copper at SP1 and SP2 in the 2023–2024 reporting year, proposing a mandatory minimum penalty of $9,000. Defendant accepted the offer and waived its right to a hearing on or about January 23, 2026, and the Regional Board's Executive Officer executed a Stipulated Order on July 7, 2026.

181. On or about July 22, 2026, the Regional Board issued to Defendant Settlement Offer No. R4-2026-0178 with respect to six NEL exceedances for zinc and copper at SP1 and SP2 in the 2024–2025 reporting year, proposing a mandatory minimum penalty of $6,000, and directing Defendant to submit a Water Quality Based Corrective Action Report and a revised SWPPP via SMARTS by September 21, 2026. Plaintiff is informed and believes, and thereupon alleges, that as of the date of this Complaint Defendant has not accepted Settlement Offer No. R4-2026-0178, no stipulated order resolving it has been issued, and no penalty has been paid.

182. Each of the Regional Board's settlement offers states that the Expedited Payment Program "does not address or resolve liability for any violation that is not specifically identified" in the exhibit to that offer. Consistent with paragraph 3 above, Plaintiff does not seek civil penalties for the specific NEL exceedances for which the Regional Board has assessed, and Defendant has paid, a mandatory minimum penalty under California Water Code section 13385.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Discharges of Contaminated Storm Water from the Facility in Violation of the General Permit's Numeric Effluent Limitations and the Act

(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))

183. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

184. Since at least March 21, 2023, Defendant has discharged storm water from the Facility containing zinc at concentrations exceeding the NEL for zinc, and since at least November 15, 2023, Defendant has discharged storm water from the Facility containing copper at concentrations exceeding the NEL for copper. General Permit, Section V.C.1 and Attachment E, Table E-2.

185. Plaintiff is informed and believes, and thereupon alleges, that discharges of storm water containing zinc and copper at concentrations exceeding the NELs occur each time storm water discharges, or has discharged, from the Facility.

186. Defendant's violations of the General Permit's NELs are ongoing and continuous.

187. Each and every violation of the General Permit's NELs is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

188. Every day, since at least March 21, 2023, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's NELs is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

189. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from January 16, 2021 to the present, except as set forth in paragraph 3 above, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

190. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

191. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SECOND CLAIM FOR RELIEF**

**Discharges of Contaminated Storm Water from the Facility in Violation of the General Permit's Receiving Water Limitations, Discharge Prohibitions, and the Act**

(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))

192. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

193. Since at least January 16, 2021, Defendant has discharged storm water from the Facility containing pollutants at concentrations that cause or contribute to exceedances of applicable water quality standards, including the CTR criteria for zinc and copper, the Basin Plan's pH range, and the Basin Plan's narrative toxicity standard, in violation of the General Permit's Receiving Water Limitations. General Permit, Section VI.A.

194. Since at least January 16, 2021, Defendant has discharged storm water from the Facility containing pollutants that adversely affect human health and the environment, in violation of the General Permit's Receiving Water Limitations. General Permit, Section VI.B.

195. Since at least January 16, 2021, Defendant has discharged storm water from the Facility containing pollutants in quantities that cause or threaten to cause pollution, contamination, or nuisance, in violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions. General Permit, Sections III.C and VI.C.

196. Since at least January 16, 2021, Defendant has discharged storm water from the Facility in violation of discharge prohibitions contained in the Basin Plan, in violation of the General Permit's Discharge Prohibitions. General Permit, Section III.D.

197. Plaintiff is informed and believes, and thereupon alleges, that discharges of storm water containing pollutants that cause or contribute to exceedances of

applicable water quality standards, adversely affect human health and/or the environment, and cause or threaten to cause pollution, contamination, or nuisance occur each time storm water discharges, or has discharged, from the Facility.

198. Defendant's violations of the General Permit's Receiving Water Limitations and Discharge Prohibitions are ongoing and continuous.

199. Each and every violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

200. Every day, since at least January 16, 2021, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's Receiving Water Limitations and Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

201. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from January 16, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

202. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

203. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## THIRD CLAIM FOR RELIEF

## Failure to Prepare, Implement, Review, and Update a Compliant Storm Water Pollution Prevention Plan

(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

204. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

205. Defendant has failed to develop and implement an adequate SWPPP for the Facility. General Permit, Section X.

206. Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring, as required by the General Permit. General Permit, Sections X.B, X.C, XV, and XX.B. Defendant continues to be in violation of the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

207. Defendant's violations of the General Permit's SWPPP requirements are ongoing and continuous.

208. Each day since at least January 16, 2021 that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

209. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from January 16, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

210. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

211. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CLAIM FOR RELIEF**

**Failure to Develop and Implement the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology**

(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

212. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

213. Defendant has failed, and continues to fail, to reduce or prevent pollutants associated with its industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT standards. General Permit, Sections V.A, X.H.1, and X.H.2.

214. Defendant discharges storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

215. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable through BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, Section V.A; 33 U.S.C. § 1311(b).

216. Defendant violates and will continue to violate the General Permit's technology-based effluent limitations each and every time storm water containing concentrations of pollutants exceeding the BAT/BCT level of control is discharged from the Facility.

217. Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

218. Defendant's violations of the General Permit's technology-based effluent

limitations and the Act are ongoing and continuous.

219. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from January 16, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

220. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

221. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FIFTH CLAIM FOR RELIEF**

**Failure to Develop and Implement an Adequate**
**Monitoring Implementation Plan for the Facility**

(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

222. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

223. Defendant has failed to develop and implement a legally adequate monitoring and reporting program for the Facility, including by failing to collect and analyze samples from the required number of QSEs in each half of each reporting year, failing to analyze its samples for all required parameters, and failing to timely submit sampling and analytical results via SMARTS. General Permit, Sections X.I and XI.

224. Defendant's violations of the General Permit's monitoring requirements and the Act are ongoing and continuous.

225. Each day since at least January 16, 2021 that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

226. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from January 16, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

227. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

228. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SIXTH CLAIM FOR RELIEF

### Failure to Report as Required by the General Permit

(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

229. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

230. Section XVI of the General Permit requires a discharger to certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year, which must include a compliance checklist indicating whether the discharger complies with, and has addressed, all applicable requirements of the General Permit; an explanation for any non-compliance within the reporting year; an identification of all revisions made to the SWPPP within the reporting year; and the

date of the Annual Evaluation. General Permit, Section XVI.

231. Section XII of the General Permit requires a discharger whose discharges exceed an NAL to prepare and submit via SMARTS ERA Level 1 and Level 2 reports, and Section XX.B of the General Permit requires a discharger whose discharges exceed an NEL or violate the Receiving Water Limitations to conduct a facility evaluation, assess its SWPPP, and certify and submit via SMARTS documentation of the additional BMPs and SWPPP implementation measures identified. General Permit, Sections XII and XX.B.

232. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to submit all reports required by Sections XII and XX.B of the General Permit in response to its exceedances of NELs and NALs, has failed to accurately report its non-compliance with the General Permit in the Facility's Annual Reports, and has failed to correctly report its compliance with the General Permit's sampling and analysis requirements. As such, Defendant is in daily violation of the General Permit.

233. Defendant has been in violation of Sections XII, XVI, and XX.B of the General Permit since at least January 16, 2021.

234. Defendant's violations of the reporting requirements of the General Permit and the Act are ongoing and continuous.

235. Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and the Act occurring from January 16, 2021 to the present, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

236. An action for injunctive relief is authorized by Section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

237. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

because an actual controversy exists as to the rights and other legal relations of the parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a. Declare Defendant to have violated and to be in violation of the General Permit and the Clean Water Act as alleged herein;

b. Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the General Permit;

c. Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d. Order Defendant to immediately implement storm water pollution control technologies and measures that satisfy BAT and BCT and that prevent pollutants in the Facility's storm water discharges from exceeding applicable NELs or causing or contributing to violations of any water quality standards;

e. Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f. Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and to implement procedures to regularly review and update the SWPPP;

g. Order Defendant to pay civil penalties of up to $68,445 per day per violation for each violation of the General Permit and the Act occurring from January 16, 2021 to the present, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. §§

19.1–19.4;

h. Order Defendant to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by its activities;

i. Award Plaintiff its costs of litigation, including reasonable attorney, expert witness, and consultant fees, as authorized by Section 505(d) of the Act, 33 U.S.C. § 1365(d); and

j. Award such other and further relief as this Court may deem just and appropriate.

Dated: September 30, 2026

Respectfully submitted,

LAW OFFICE OF WILLIAM CARLON

By: /s/ William N. Carlon
William N. Carlon
Attorneys for Plaintiff
LOS ANGELES WATERKEEPER