LOS ANGELES WATERKEEPER®

January 16, 2026

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Horst Rieger, CEO & Managing Director
Harry Glieder, Secretary, CFO, Director
Wolfgang Plasser, Director
Pankl Aerospace Systems
16615 Edwards Road
Cerritos, CA 90703

Hugh T. Verano, Agent for Service of Process
Pankl Aerospace Systems
1000 Station Loop Road
Park City, CA 84098

**Re: NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33 U.S.C. §§ 1251 *et seq.*)**

Dear Horst Rieger, Harry Glieder, Wolfgang Plasser, and Hugh Verano:

This firm represents Los Angeles Waterkeeper ("LA Waterkeeper") regarding violations of the Clean Water Act (also referred to herein as the "Act") occurring at Pankl Aerospace Systems's facility located at 16615 Edwards Road, in Cerritos, California 90703 ("Facility"). This letter is being sent to you individually, as the responsible owners and/or operators of the enterprise, and as the registered agent for these entities. Unless otherwise noted, Horst Rieger, Harry Glieder, Wolfgang Plasser, Hugh Verano, and Pankl Aerospace Systems shall hereinafter be collectively referred to as "Pankl." The purpose of this letter is to provide Pankl with notice of the violations of the Industrial General Permit occurring at the Facility, including, but not limited to, noncompliant discharges of polluted storm water associated with industrial activities from the Facility into local surface waters.

Pankl is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq*., and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 14-57-DWQ as amended by Order No. 2015-0122-DWQ & Order No. 2018-0028-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use (collectively "General Permit" or "Permit").[1]

---

[1] Pankl most recently submitted a Notice of Intent ("NOI") to comply with the General Permit for the Facility on or about July 13, 2017. The Facility is assigned the Waste Discharge Identification ("WDID") Number 4 19I018975.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Act subjects Pankl to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of up to $68,445 per day per violation for all Clean Water Act violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025.

In addition to civil penalties, LA Waterkeeper will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

The Clean Water Act requires that sixty (60) days prior to the initiation of a citizen-enforcement action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen enforcer must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the Chief Administrative Officer of the water pollution control agency for the State in which the violations occur. *See* 40 C.F.R. § 135.2. As required by the Act, this letter provides statutory notice of the violations that have occurred, and continue to occur, at the Facility. 40 C.F.R. § 135.3(a). At the expiration of sixty (60) days from the date of this letter, LA Waterkeeper intends to file suit under Section 505(a) of the Act in federal court against Pankl for violations of the Clean Water Act and the Permit.

## I. Background.

### A. Los Angeles Waterkeeper

LA Waterkeeper is a 501(c)(3) public benefit corporation organized under the laws of California with its main office located in Los Angeles, California. LA Waterkeeper was founded in 1993, and its members live, work, and recreate in and around the Los Angeles area. LA Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal waters of Los Angeles County including without limitation the Los Angeles River and its tributaries. To further its mission, LA Waterkeeper actively seeks federal and state implementation of the Clean Water Act. Where necessary, LA Waterkeeper directly initiates enforcement actions on behalf of itself and its members.

Members of LA Waterkeeper own homes and reside in Los Angeles County, and use and enjoy the San Gabriel River, and its tributaries, and the bordering parks, pathways, golf courses and athletic fields. As explained in detail below, Pankl discharges pollutants into Coyote Creek, the San Gabriel River, the San Gabriel River estuary, and San Pedro Bay to the Pacific Ocean ("Receiving Waters") in violation of the Clean Water Act and the General Permit. LA Waterkeeper members also use and enjoy the Receiving Waters, including, without limitation, to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, and run. Additionally, LA Waterkeeper members use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs LA Waterkeeper members' use and enjoyment of

these waters. The unlawful discharge of pollutants from the Facility requires LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility. Thus, the interests of LA Waterkeeper and its members have been, are being, and will continue to be adversely affected by Pankl's failure to comply with the Clean Water Act and the General Permit.

**B. The Clean Water Act.**

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Bay Keeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants not specifically allowed by a NPDES permit is illegal. *Ecological Rights Found. v. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program). The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of the EPA has authorized California's State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342.

**C. California's General Permit for Storm Water Discharges Associated with Industrial Activities**

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). General Permit, Standard Condition XXI.A. These facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA. The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements.

Beginning under the General Permit Facilities must submit Exceedance Response Action Plans ("ERA Report") to the State Board outlining effective plans to reduce pollutants if a Facility reports a pollutant above the Numeric Action Level ("NAL"). An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. General Permit

Section XII.A. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. *Id.*

The General Permit contains requirements that are specific to the Total Maximum Daily Load ("TMDL") for watersheds and water bodies with U.S. EPA-approved and U.S. EPA-established TMDLs for Dischargers covered by the General Permit. TMDLs relate to the maximum amount of a pollutant that a water body can receive and still attain water quality standards. Dischargers located within a watershed for which a TMDL has been approved by U.S. EPA shall comply with any applicable TMDL-specific permit requirements that are set forth in Attachment E to the General Permit. General Permit, V.C. Dischargers shall compare all sampling and analytical results from each distinct sample to the corresponding instantaneous Numeric Effluent Limitations ("NEL") values in the TMDL Compliance Table E-2. *Id.*, Attachment C at 5. An exceedance of an NEL occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceeds the instantaneous maximum NEL value. *Id.* An exceedance of an NEL is a violation of the General Permit. *Id.*

**D. Pankl's Cerritos Facility**

Pankl's Facility is located at 16615 Edwards Road in Cerritos, California 90703. According to its SWPPP, last updated January 31, 2023 ("2023 SWPPP"), the Facility's primary industrial purpose is production of aerospace components involving high precision turning, milling, honing, trepanning, gun drilling, and upsetting of parts up to 30' in length. The 2023 SWPPP also states that the Facility's business hours are Monday through Friday from 8:00 a.m. to 8:00 p.m.

The 2023 SWPPP indicates that Pankl conducts industrial activities both indoors and outdoors at the approximately 3.4-acre Facility. Industrial activities at the Facility include, but are not limited to: high precision turning, milling, honing, trepanning, gun drilling, and upsetting of parts up to 30' in length; outdoor materials storage; shipping and receiving; and, operation of equipment in support of these activities.

Under the General Permit, Pankl is required to analyze its samples of storm water for total suspended solids, oil and grease, and pH. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis for parameters identified in a pollutant source assessment, for parameters related to receiving water impairments, or as required by the Regional Board. General Permit, Section XI.B.6. According to the Facility's NOI, Pankl operates under Standard Industrial Classification ("SIC") Code 3728 ("Aircraft parts and auxiliary equipment"). Pursuant to the Clean Water Act Section 303(d) list of impaired waterbodies, the North Fork of Coyote Creek is also impaired for oil and grease, zinc, selenium and indicator bacteria. Coyote Creek is listed for the following water quality impairments: aluminum, ammonia, chloride, chlorine, cyanide, profenofos, temperature, copper, indicator bacteria, iron, malathion, pH, and toxicity. The San Gabriel River (Reach 1) is listed for the following water quality impairments: DDT, indicator bacteria, oil and grease, pH and temperature. The San Gabriel River Estuary is listed for the following water quality impairments: chlordane, chlorine, temperature, toxicity, copper, dioxin, indicator bacteria, nickel, and dissolved oxygen. Alamitos Bay is listed for the following water quality impairments: copper,

DDD, DDT, PCBs, indicator bacteria and dissolved oxygen. San Pedro Bay is listed for copper, DDE, temperature, chlordane, PCBs, Total DDT, and toxicity. The following impairments exist within the HUC10 watershed: ammonia, cyanide, diazinon, dissolved oxygen, *E. coli* and enterococcus, copper, dissolved copper, zinc, lead, cadmium, nitrates and nitrites, oil and pH. The SWPPP states that of those listed impairments, copper, aluminum, nickel, zinc, oil, nitrate, nitrite, and pH are associated with the industrial activities at the Facility.

According to its 2023 SWPPP, Pankl collects storm water associated with industrial activities at the Facility and discharges at two locations, one located at the north Edwards entrance and the other at the east Edwards entrance. The 2023 SWPPP suggests that the runoff at the north Edwards entrance enters a three-foot municipal catch basin, while the east Edwards runoff travels south on Edwards approximately 0.2 miles and enters a twelve-foot municipal catch basin. The 2023 SWPPP indicates that both discharge points flow to Coyote Creek. The LA County Public Works MS4 map, indicates that the Facility's runoff flows to the north toward 166th Street and enters the MS4 there, and then flows via the "Carmenita Drain – Main" to the east where it discharges into the North Fork of Coyote Creek. The discharge that flows to the east runs south along Edwards Road until it reaches an MS4 drain labelled "MTD 132," which also discharges to the North Fork of Coyote Creek.

The SWPPP suggests that the Facility is divided into two distinct drainage areas: DMA 1 and DMA 2. There is also an additional drainage area that is marked as a parking lot. Each drainage area contains industrial operations and discharges stormwater through separate stormwater conveyance and treatment systems into the MS4.

DMA 1 is a small portion of the Facility in the northwest corner that discharges to 166th Street, as discussed above. DMA 2 encompasses most of the western and southern portions of the Facility, and it receives the runoff from the Facility's roof via several downspouts along the west and south sides of the main building.

The Facility conducts high-precision aerospace component manufacturing using a range of metal alloys, including aluminum, steel, stainless steel, and titanium. All primary machining operations—such as lathe work, grinding, drawing, honing, milling, soaking, and trepanning—occur inside the main manufacturing building. These processes generate metal debris that is initially contained at each machine and later staged for off-site recycling. Despite housekeeping practices, the 2023 SWPPP acknowledges that metal debris may be tracked from indoor processing areas into outdoor areas through routine foot and forklift traffic.

Each machining system uses significant volumes of oil to facilitate metal processing, with individual machine oil capacities ranging from approximately 52 to 1,000 gallons. The 2023 SWPPP recognizes that a rupture or failure of these oil systems presents a substantial spill risk, with the potential for oils to migrate outdoors and discharge from the property if containment and spill response controls fail. In addition, compressed air for plant operations is supplied by outdoor compressors located on the west side of the building. These compressors generate oily water that is collected in 55-gallon drums stored on containment pallets. The 2023 SWPPP identifies drum overflow or tip-over as a plausible spill scenario that could result in discharge through the north Edwards entrance if not promptly controlled.

Truck and forklift traffic is concentrated at the north Edwards gate and along the west side of the property. The 2023 SWPPP acknowledges that tire wear from tight turning movements generates tire tread debris that accumulates on outdoor pavement. Because zinc oxide is commonly used as a tire filler compound, the 2023 SWPPP identifies tire debris as a potential source of zinc in stormwater runoff from these traffic areas.

The majority of outdoor industrial storage activities occur west of the property. Metal alloy stock—including steel, stainless steel, titanium, and inconel—is stored outdoors in racks and is subject to weather exposure. The 2023 SWPPP acknowledges that surface oxidation of these metals can occur and that dissolved metals may be mobilized by stormwater if materials are left uncovered. The 2023 SWPPP states that discharges from these areas flow toward the north Edwards gate. In addition, metal debris generated indoors is stored outdoors in both cubic-yard bins and 20-foot roll-off containers. This debris is contaminated with cutting oils, and the 2023 SWPPP acknowledges that many roll-off bins are in poor condition and may contain holes or cracks capable of releasing metal particulates and oil-laden liquids if exposed to stormwater.

Hazardous waste and liquid hazardous materials are stored outdoors at the southwest portion of the property. Hazardous wastes primarily include used oils and, to a lesser extent, caustic solutions, stored in 55-gallon containers on secondary containment pallets. Liquid industrial materials such as gear oil, lubricants, hydraulic oil, and solvents (including acetone) are likewise stored in drums with secondary containment. The 2023 SWPPP acknowledges that a tip-over or failure of these containers could result in releases of up to 55 gallons and that spills from these areas could migrate offsite toward east Edwards if not fully contained.

The areas of industrial activities are sources of pollutants at the Facility. From these drainage areas, the Facility discharges to municipal storm drains that discharge to the North Fork of Coyote Creek, the San Gabriel River, and ultimately to the Pacific Ocean. The Receiving Waters are waters of the United States within the meaning of the Clean Water Act.

## II. Pankl's Violations of the Act and Permit.

On July 1, 2020, the amendment to the General Permit by Order No. 2018-0028-DWQ became enforceable and updated pollutant-discharge standards including Total TMDL Implementation Requirements and Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use. General Permit Attachment E. Any exceedance of a Numeric Effluent Limitation ("NEL") following July 1, 2020 is a per se violation of the General Permit and Clean Water Act. For this Facility, the applicable NELs include copper (0.027 mg/L), zinc (0.158 mg/L), and lead (0.106 mg/L). In recent reporting years, and also following the implementation of the NEL for the North Fork of Coyote Creek, and the San Gabriel River, Pankl had numerous exceedances, and LA Waterkeeper alleges that Pankl will continue to exceed the NELs in the future.

Based on its review of available public documents, LA Waterkeeper is informed and believes that Pankl, through its operation of the Facility, is in ongoing violation of both the substantive and procedural requirements of the CWA and the General Permit. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to

citizen enforcement actions brought pursuant to the federal Clean Water Act, Pankl is subject to penalties for violations of the Act since January 16, 2021.

### A. Pankl Discharges Storm Water Containing Pollutants in Violation of the General Permit's Discharge Prohibitions, Receiving Water Limitations and Effluent Limitations.

Pankl's storm water sampling results provide conclusive evidence of Pankl's failure to comply with the General Permit's discharge prohibitions, receiving water limitations and effluent limitations at its Facility. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1987).

#### 1. Applicable Water Quality Standards.

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Water Board's Basin Plan or statewide water quality control plans and policies. General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. General Permit, Receiving Water Limitations VI.A, VI.B.

Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water best management practices ("BMPs") in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). The CTR establishes numeric receiving water limits for toxics pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for at least some of the pollutants discharged by Pankl: zinc – 0.12 mg/L (maximum concentration), copper – 0.013 mg/L (maximum concentration), nickel – 0.470 mg/L (maximum concentration).

The Water Quality Control Plan for the Los Angeles Region ("Basin Plan") sets forth water quality standards and prohibitions applicable to Pankl's storm water discharges from its Facility. The Basin Plan includes a narrative toxicity standard which states that "(a)ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." The Basin Plan's Water Quality Standards require narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the San Gabriel River.

**2. Applicable Effluent Limitations.**

Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. General Permit, Effluent Limitation V.A. Conventional pollutants include total suspended solids, oil & grease, pH, biochemical oxygen demand and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") and Numeric Action Levels ("NAL") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. *Santa Monica Baykeeper v. Kramer Metals,* 619 F. Supp. 2d 914, 920, 923 (C.D. Cal 2009); General Permit, Exceedance Response Action XII.A.

The following EPA benchmarks have been established for pollutants discharged by Pankl: total suspended solids – 100 mg/L; pH – 6.0-9.0 s.u.; zinc – 0.12 mg/L; aluminum – 1.1 mg/L; copper – 0.00519 mg/L; nickel – 0.470 mg/L; and, nitrate plus nitrite nitrogen – 0.68 mg/L. The following Annual NALs have been established for pollutants discharged by Pankl: total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; zinc – 0.26 mg/L; aluminum – 0.75 mg/L; copper – 0.0332 mg/L; iron – 1.0 mg/L; nickel – 1.02 mg/L; and nitrate plus nitrite nitrogen – 0.68 mg/L. Additionally, the following instantaneous NALs have been established for pollutants discharged by Pankl: pH – 6.0-9.0 s.u.; total suspended solids – 400 mg/L; and oil & grease – 25.0 mg/L.

The General Permit also requires a permittee whose discharges violate the General Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TNALs, and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Action in Section XX.B of the General Permit and report to the Regional Board regarding the same. General Permit, Section XX.B. As noted above, the NELs established numeric limits for some of the pollutants discharged by Pankl: copper (0.027 mg/L) and zinc (0.158 mg/L).

**3. Pankl's Storm Water Sample Results**

As detailed above, Pankl's SWPPP describes two discharge points/sampling locations (S1 and S2). Storm water discharged from the Facility flows into the MS4 to the Receiving Waters.

Except as provided in Section XI.C.4 of the General Permit, samples shall be collected from each drainage area at all discharge locations. The samples must be: a) representative of storm water associated with industrial activities and any commingled authorized non-storm water

discharges; or, b) associated with the discharge of contained storm water. At this time, LA Waterkeeper is unable to determine if storm water from the two sampling points at the Facility is representative of industrial storm water at the Facility.

The following discharges of pollutants from the Facility have violated the discharge prohibitions, receiving water limitations and effluent limitations of the Permit:

**a. Discharge of Storm Water Containing Zinc at Concentrations in Excess of Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | Numeric Effluent Limitation (mg/L) | CTR & EPA Benchmark (mg/L) | NAL (mg/L) |
|---|---|---|---|---|---|---|
| 11/15/2025 | SP 2 – 166th St | Zn | 0.235 | 0.158 | 0.12 | 0.26 |
| 10/14/2025 | SP 2 – 166th St | Zn | 1.04 | 0.158 | 0.12 | 0.26 |
| 10/14/2025 | SP 1 – Edwards Rd | Zn | 0.213 | 0.158 | 0.12 | 0.26 |
| 3/5/2025 | SP 1 – Edwards Rd | Zn | 0.645 | 0.158 | 0.12 | 0.26 |
| 3/5/2025 | SP 2 – 166th St | Zn | 0.235 | 0.158 | 0.12 | 0.26 |
| 2/13/2025 | SP 1 – Edwards Rd | Zn | 1.25 | 0.158 | 0.12 | 0.26 |
| 2/13/2025 | SP 2 – 166th St | Zn | 6.86 | 0.158 | 0.12 | 0.26 |
| 1/27/2025 | SP 1 – Edwards Rd | Zn | 1.25 | 0.158 | 0.12 | 0.26 |
| 1/27/2025 | SP 2 – 166th St | Zn | 6.86 | 0.158 | 0.12 | 0.26 |
| 2/20/2024 | SP 1 – Edwards Rd | Zn | 0.170 | 0.158 | 0.12 | 0.26 |
| 2/1/2024 | SP 1 – Edwards Rd | Zn | 0.315 | 0.158 | 0.12 | 0.26 |
| 1/3/2024 | SP 1 – Edwards Rd | Zn | 0.15 | 0.158 | 0.12 | 0.26 |
| 12/21/2023 | SP 2 – 166th St | Zn | 0.297 | 0.158 | 0.12 | 0.26 |
| 11/15/2023 | SP 1 – Edwards Rd | Zn | 0.738 | 0.158 | 0.12 | 0.26 |
| 8/21/2023 | SP 1 – Edwards Rd | Zn | 0.337 | 0.158 | 0.12 | 0.26 |

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | Numeric Effluent Limitation (mg/L) | CTR & EPA Benchmark (mg/L) | NAL (mg/L) |
|---|---|---|---|---|---|---|
| 3/21/2023 | SP 1 – Edwards Rd | Zn | 0.143 | 0.158 | 0.12 | 0.26 |
| 3/21/2023 | SP 2 – 166th St | Zn | 0.159 | 0.158 | 0.12 | 0.26 |

**b. Discharge of Storm Water Containing Aluminum at Concentrations in Excess of Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark (mg/L) | NAL (mg/L) |
|---|---|---|---|---|---|
| 11/15/2025 | SP 2 – 166th St | Al | 1.63 | 1.1 | 0.75 |
| 2/13/2025 | SP 1 – Edwards Rd | Al | 4.44 | 1.1 | 0.75 |
| 1/27/2025 | SP 1 – Edwards Rd | Al | 4.44 | 1.1 | 0.75 |
| 8/21/2023 | SP 1 – Edwards Rd | Al | 0.803 | 1.1 | 0.75 |
| 5/31/2023 | SP 2 – 166th St | Al | 0.795 | 1.1 | 0.75 |
| 3/21/2023 | SP 2 – 166th St | Al | 1.53 | 1.1 | 0.75 |
| 12/29/2021 | SP 1 – Edwards Rd | Al | 0.9 | 1.1 | 0.75 |

**c. Discharge of Storm Water Containing Copper Violating Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | NAL (mg/L) | NEL (mg/L) | CTR (mg/L) |
|---|---|---|---|---|---|---|
| 3/13/2025 | SP 2 – 166th St | Cu | 0.0151 | 0.0332 | 0.027 | 0.013 |
| 2/13/2025 | SP 1 – Edwards Rd | Cu | 0.0501 | 0.0332 | 0.027 | 0.013 |
| 2/13/2025 | SP 2 – 166th St | Cu | 0.0416 | 0.0332 | 0.027 | 0.013 |
| 1/27/2025 | SP 1 – Edwards Rd | Cu | 0.0501 | 0.0332 | 0.027 | 0.013 |
| 1/27/2025 | SP 2 – 166th St | Cu | 0.0416 | 0.0332 | 0.027 | 0.013 |
| 2/1/2024 | SP 1 – Edwards Rd | Cu | 0.0148 | 0.0332 | 0.027 | 0.013 |
| 11/15/2023 | SP 1 – Edwards Rd | Cu | 0.0601 | 0.0332 | 0.027 | 0.013 |
| 11/15/2023 | SP 2 – 166th St | Cu | 0.0148 | 0.0332 | 0.027 | 0.013 |
| 5/31/2023 | SP 2 – 166th St | Cu | 0.023 | 0.0332 | 0.027 | 0.013 |
| 3/21/2023 | SP 2 – 166th St | Cu | 0.0144 | 0.0332 | 0.027 | 0.013 |

**d. Discharge of Storm Water Containing Nitrogen at Concentrations in Excess of Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | EPA Benchmark/NAL (mg/L) |
|---|---|---|---|---|
| 10/14/2025 | SP 2 – 166th St | N+N | 1.82 | 0.68 |
| 11/15/2023 | SP 2 – 166th St | N+N | 6.04 | 0.68 |
| 3/15/2021 | SP 1 – Edwards Rd | N+N | 0.8 | 0.68 |

**e. Discharge of Storm Water Containing Total Suspended Solids at Concentrations in Excess of Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | Annual NAL (mg/L) |
|---|---|---|---|---|
| 3/5/2025 | SP 1 – Edwards Rd | TSS | 229 | 100 |
| 2/13/2025 | SP 1 – Edwards Rd | TSS | 154 | 100 |
| 2/13/2025 | SP 2 – 166th St | TSS | 261 | 100 |
| 1/27/2025 | SP 1 – Edwards Rd | TSS | 154 | 100 |
| 1/27/2025 | SP 2 – 166th St | TSS | 261 | 100 |
| 2/1/2024 | SP 1 – Edwards Rd | TSS | 115 | 100 |
| 11/15/2023 | SP 2 – 166th St | TSS | 182 | 100 |
| 8/21/2023 | SP 1 – Edwards Rd | TSS | 112 | 100 |

**f. Discharge of Storm Water Containing Iron at Concentrations in Excess of Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | Annual NAL (mg/L) |
|---|---|---|---|---|
| 11/15/2025 | SP 2 – 166th St | Fe | 1.54 | 1.0 |
| 2/1/2024 | SP 1 – Edwards Rd | Fe | 1.03 | 1.0 |
| 5/31/2023 | SP 2 – 166th St | Fe | 1.79 | 1.0 |
| 3/21/2023 | SP 1 – Edwards Rd | Fe | 1.13 | 1.0 |

**g. Discharge of Storm Water Containing Chemicals Affecting pH at Levels Outside of Applicable Water Quality Standards**

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | Instantaneous Maximum NAL/EPA Benchmark (s.u.) | Basin Plan (s.u.) |
|---|---|---|---|---|---|
| 11/15/2023 | SP 1 – Edwards Rd | pH | 9.7 | 6.0-9.0 | 6.5-8.5 |

| Date | Discharge Point | Parameter | Concentration in Discharge (mg/L) | Instantaneous Maximum NAL/EPA Benchmark (s.u.) | Basin Plan (s.u.) |
|---|---|---|---|---|---|
| 11/15/2023 | SP 2 – 166th St | pH | 9.6 | 6.0-9.0 | 6.5-8.5 |
| 3/21/2023 | SP 1 – Edwards Rd | pH | 6 | 6.0-9.0 | 6.5-8.5 |
| 3/21/2023 | SP 2 – 166th St | pH | 6.2 | 6.0-9.0 | 6.5-8.5 |
| 3/15/2021 | SP 1 – Edwards Rd | pH | 3.5 | 6.0-9.0 | 6.5-8.5 |

**h. Pankl's Sample Results Are Evidence of Violations of the General Permit**

Pankl's sample results demonstrate violations of the Permit's discharge prohibitions, receiving water limitations and effluent limitations set forth above. LA Waterkeeper is informed and believes that Pankl has known that its storm water contains pollutants at levels exceeding applicable water quality standards since at least January 16, 2021, including at least sixteen exceedances of water quality standards for zinc (all but two of which are above the NEL); six exceedances of water quality standards for aluminum; ten exceedances of water quality standards for copper (half of which are above the NEL); three exceedances of water quality standards for nitrate plus nitrite nitrogen; eight exceedances of water quality standards for total suspended solids; three exceedances of water quality standards for iron; and five instances where pH was measured outside the applicable water quality standards.

LA Waterkeeper alleges that such violations occur each time storm water discharges from the Facility. **Attachment A** hereto, sets forth the specific rain dates on which LA Waterkeeper alleges that Pankl has discharged storm water containing impermissible levels of zinc, aluminum, copper, nitrate plus nitrite nitrogen, total suspended solids, iron, and chemical affecting pH in violation of the General Permit. General Permit, Discharge Prohibitions III.C and III.D; Receiving Water Limitations VI.A, VI.B; Effluent Limitations V.A and V.C.

**4. Pankl Has Failed to Implement BAT and BCT**

Dischargers must implement BMPs that fulfill the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their storm water discharges. General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* General Permit, Sections V, X.H.1-2.

Pankl has failed to implement and maintain the minimum BMPs required by the General Permit as evidenced by the exceedances identified above. Specifically, Pankl has failed to comply with the following: good housekeeping requirements, preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality

assurance; and record keeping. Permit, Section X.H.1(a-g).

Pankl has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. General Permit, Sections X.H.2. Pankl's own storm water sampling results are further evidence of its failure to implement BMPs that meet the BAT/BCT standards. In reporting years identified below, Pankl has exceeded the annual NAL for aluminum, copper, nitrate plus nitrite nitrogen, TSS, and zinc, as well as the instantaneous NAL for pH. LA Waterkeeper alleges that if Pankl had collected the required number of samples in each reporting period, it would have exceeded the annual NAL for additional pollutants, and in additional years.

| **Reporting Year** | **Pollutant** | **Average Pollutant Concentration** | **Numeric Action Level (Annual)** |
|---|---|---|---|
| 2024-2025 | Al | 1.24 mg/L[2] | 0.75 mg/L |
| 2021-2022 | Al | 0.9 mg/L | 0.75 mg/L |
| 2024-2025 | Cu | 0.0350 mg/L | 0.0332 mg/L |
| 2025-2026 | N+N | 1.00 mg/L[3] | 0.68 mg/L |
| 2020-2021 | N+N | 0.80 mg/L | 0.26 mg/L |
| 2023-2024 | pH | Exceeded Instantaneous NAL twice (9.7 s.u. and 9.6 s.u.) | 6.0-9.0 s.u. |
| 2024-2025 | TSS | 147.13 mg/L | 100 mg/L |
| 2025-2026 | Zn | 0.63 mg/L[3] | 0.26 mg/L |
| 2024-2025 | Zn | 1.93 mg/L | 0.26 mg/L |

Based on the Facility's own ERA Level 2 Action Plan and subsequent Technical Reports, the Facility's repeated NAL exceedances for N+N and aluminum have been consistently attributed to known industrial sources, including: (1) handling and storage of spent CNC coolant; (2) leaking and poorly maintained outdoor scrap and roll-off bins containing oil-laden metal debris; and (3) tracking of metal particulates and coolant residuals from indoor machining operations to outdoor paved areas where pollutants commingle with stormwater runoff. Despite identifying these recurring industrial sources as the cause of exceedances, the Facility has not implemented structural treatment controls or equivalent physical source controls required under the BAT/BCT standard.

Instead, as documented in the Facility's ERA submissions, the primary and nearly

---

[2] As noted above, Pankl certified results to the SMARTS website for February 13, 2025 and January 27, 2025. However, no lab report for February 13, 2025 was uploaded to SMARTS, and the sample results reported for that day are identical to the sample results reported in the January 27, 2025 lab report. Since the submissions to SMARTS are made under penalty of perjury, LA Waterkeeper will use all of the reported data for its calculations, and for the purpose of this letter. In any event, the average for 2024-2025 for aluminum would still exceed the annual NAL (0.87 mg/L).
[3] Only one storm has been sampled at the date of this letter.

exclusive BMPs relied upon to address repeated exceedances consist of non-structural administrative measures, including increased housekeeping, sweeping, employee training, material management practices, and general preventative maintenance. While housekeeping was reported to have temporarily reduced certain parameters, the Facility simultaneously documented the emergence of new pollutant exceedances (including aluminum) originating from the same outdoor scrap storage and roll-off bin areas that had already been identified as leaking and in poor condition. The continued reliance on sweeping, training, and discretionary material management—without installation of structural containment, treatment, filtration, or isolation controls—does not constitute implementation of BAT/BCT as required under the Industrial General Permit. Since the implementation of these BMPs, the Facility has continued to report exceedances of N+N and aluminum, as well as TSS, zinc, and copper – entering ERA Level 1 for each of those parameters in the 2024-2025 reporting year.

The Facility further acknowledged that at least one primary roll-off bin used for outdoor metal debris storage was in poor condition, actively leaking, and reliant only on a drip pan for containment, with no confirmed replacement implemented. The Facility also acknowledged that outdoor scrap metal bins must be manually covered to prevent exposure to stormwater runoff, yet continued aluminum exceedances demonstrate that these manual controls have not been reliably effective, further confirming the absence of enforceable, fixed, treatment-based BAT/BCT controls.

With respect to pH exceedances, the Facility acknowledged that improper sampling system calibration caused exceedances, and selected employee retraining as the sole corrective action. While proper calibration is required for monitoring accuracy, reliance solely on administrative retraining—particularly where hazardous waste storage and spill pathways remain present onsite—does not satisfy the Facility's independent obligation to implement BAT/BCT to control pollutant exposure at the source.

Taken together, the Facility's own records establish that the Facility has long-standing, well-defined industrial sources of stormwater pollutants; that the Facility has experienced repeated NAL exceedances across multiple parameters and years; that the Facility has chosen not to install structural BMPs, treatment systems, or permanent containment infrastructure; and that the Facility instead continues to rely almost exclusively on housekeeping, sweeping, material management, and employee training as its primary response.

These measures, by the Facility's own admissions and documented outcomes, have failed to prevent recurring exceedances and the emergence of new pollutant parameters, demonstrating that the Facility has not implemented BAT/BCT as required by the Industrial General Permit and the Clean Water Act. Each day that Pankl has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Pankl has been in violation of the BAT and BCT requirements at its Facility every day since at least January 16, 2021.

### 5. Pankl Has Failed to Comply with the Monitoring Requirements of the General Permit.

The General Permit requires dischargers to implement a Monitoring Implementation Plan. General Permit, Section X.I. As part of their monitoring plan, dischargers must identify all storm water discharge locations. Permit, Section X.I.2. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events. General Permit, Section XI.A.1 and 2.

Dischargers must collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 30). General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the storm water discharged from the facility based on the pollutant source assessment. General Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. General Permit, Section XI.B.11.

Pankl has failed to develop and implement an adequate Monitoring Implementation Plan for its Facility, and has thus violated the monitoring requirements of the General Permit. Pankl has failed to collect the required number of samples for each reporting period, and has failed to have each of those samples analyzed for all required parameters. For example, Pankl failed to have their storm water samples analyzed for copper since at least December 12, 2020 until March 21, 2023; and, Pankl failed to collect the required number of samples from the following discharge points during the specified reporting years:

| Reporting Year | Discharge Point | Number of Samples Collected in 1st Half of Reporting Period | Number of Samples Collected in 2nd Half of Reporting Period |
|---|---|---|---|
| 2020-2021 | SP 1 | 0 | 1 |
| 2020-2021 | SP 2 | 0 | 0 |
| 2021-2022 | SP 1 | 1 | 0 |
| 2021-2022 | SP 2 | 0 | 0 |
| 2022-2023 | SP 1 | 0 | 2 |
| 2022-2023 | SP 2 | 0 | 3 |
| 2024-2025 | SP 1 | 0 | 4 |
| 2024-2025 | SP 2 | 0 | 4 |

Each day that Pankl has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and Permit. Pankl has been in violation of the Monitoring requirements every day since at least January 16, 2021.

**6. Pankl Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and, (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. General Permit, Section X.B.

LA Waterkeeper's investigation indicates that Pankl has been operating with an inadequately developed and implemented SWPPP in violation of General Permit requirements. Pankl has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, has failed to develop and implement an adequate site map, and has failed to describe and evaluate the industrial materials and potential pollutant sources at the Facility, all of which have resulted in the Facility's numerous continuing effluent limitation violations.

Each day Pankl failed to develop and implement an adequate SWPPP at its Facility is a violation of the General Permit. The SWPPP violations described above were at all times in violation of Section X of the General Permit. Pankl has been in violation of these requirements at its Facility every day since at least January 16, 2021.

**7. Pankl Has Failed to Submit Timely, True and Correct Reports.**

Section XVI of the Permit requires dischargers to submit an Annual Report by July 15th of each reporting year to the Regional Board. The Annual Report must be signed and certified by a discharger's Legally Responsible Person, or Duly Authorized Representative. General Permit, Sections XVI.A, XXI.K. The Annual Report must include a compliance checklist, certifying compliance with the General Permit and an explanation of any non-compliance. General Permit, Section XVI.B.

The General Permit also requires dischargers who exceed NELs and NALs to comply with Water Quality Based Corrective Action, Section XX.B, and Exceedance Response Actions, Section XII, respectively.

LA Waterkeeper's investigations indicate that Pankl has failed to submit all required reports pursuant to Sections XX.B and XII in response to their numerous exceedances of both

NELs and NALs. Further, Pankl's ERA reports are inadequate as evidenced by the continued exceedances, even after apparently full implementation of the BMPs described therein. Each day Pankl failed to submit timely, true and correct reports is a separate violation of the Clean Water Act. Pankl has been in violation of these requirements at its Facility every day since at least January 16, 2021.

## III. Persons Responsible for the Violations.

LA Waterkeeper puts Pankl on notice that they are the persons and entities responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, LA Waterkeeper puts Pankl on formal notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Parties.

The name, address and telephone number of each of the noticing parties is as follows:

Bruce Reznik, Executive Director
Los Angeles Waterkeeper
360 E 2nd Street Suite 250
Los Angeles, CA 90012
(310) 394-6162

## V. Counsel.

LA Waterkeeper has retained legal counsel to represent it in this matter. Please direct all communications to:

William N. Carlon
Law Office of William Carlon
437 Post Street
Napa, CA 94559
(530) 5144115
william@carlonlaw.com

## VI. Conclusion

LA Waterkeeper believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. We intend to file a citizen suit under Section 505(a) of the CWA against Pankl and their agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

William N. Carlon
Law Office of William Carlon
Counsel for LOS ANGELES
WATERKEEPER

**SERVICE LIST**

**VIA CERTIFIED MAIL**

Lee Zeldin, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

Mike Martucci, Acting Regional Administrator
U.S. Environmental Protection Agency, Region IX
75 Hawthorne Street
San Francisco, CA 94105

Pamela Bondi, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Eric Oppenheimer, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

Susana Arredondo, Executive Officer
Los Angeles Regional Water Quality Control Board
320 W 4th Street, #200
Los Angeles, CA 90013

**ATTACHMENT A**
**Notice of Intent to File Suit, Pankl**
**Significant Rain Events,* January 16, 2021 – January 16, 2026**

January 23, 2021
January 25, 2021
January 28, 2021
January 29, 2021
March 3, 2021
March 10, 2021
March 11, 2021
March 15, 2021
October 23, 2021
October 25, 2021
December 14, 2021
December 23, 2021
December 24, 2021
December 25, 2021
December 29, 2021
December 30, 2021
March 19, 2022
March 28, 2022
April 22, 2022
June 22, 2022
September 9, 2022
October 12, 2022
November 8, 2022
December 11, 2022
December 12, 2022
December 27, 2022
December 31, 2022
January 3, 2023
January 4, 2023
January 5, 2023
January 9, 2023
January 10, 2023
January 14, 2023
January 15, 2023
January 16, 2023
January 29, 2023
January 30, 2023
February 23, 2023
February 24, 2023
February 25, 2023
February 27, 2023
February 28, 2023
March 1, 2023
March 10, 2023
March 11, 2023
March 14, 2023
March 15, 2023
March 20, 2023
March 21, 2023
March 29, 2023
March 30, 2023
May 4, 2023
August 20, 2023
August 21, 2023
November 15, 2023
December 20, 2023
December 21, 2023
December 22, 2023
December 30, 2023
January 3, 2024
January 20, 2024
January 22, 2024
January 25, 2024
February 1, 2024
February 4, 2024
February 5, 2024
February 6, 2024
February 7, 2024
February 19, 2024
February 20, 2024
February 21, 2024
March 2, 2024
March 6, 2024
March 23, 2024
March 29, 2024
March 30, 2024
March 31, 2024
April 5, 2024
April 13, 2024
April 14, 2024
May 5, 2024
January 26, 2025
January 27, 2025
February 5, 2025
February 6, 2025
February 7, 2025
February 12, 2025
February 13, 2025
March 5, 2025
March 6, 2025
March 13, 2025
April 26, 2025
October 14, 2025
November 14, 2025
November 15, 2025
November 16, 2025
November 17, 2025
November 20, 2025
November 21, 2025
December 23, 2025
December 24, 2025
December 25, 2025
December 26, 2025

* Significant Rain Events are days where the 24-hour rainfall total was at least 0.1 inches according to publicly available rain and weather data collected at a station located near the Facility.